## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**BEVERLY DREDGING, L.L.C.**                                    CIVIL ACTION

**VERSUS**                                                          No. 23-1469

**FMT SHIPYARD & REPAIR, LLC ET AL.**                          SECTION I

## <u>AMENDED ORDER & REASONS</u>

Before the Court are defendants Boland Maine & Industrial, LLC's ("Boland") and FMT Shipyard & Repair, LLC's ("FMT") motions[1] for summary judgment. Plaintiff Beverly Dredging, LLC ("Beverly") opposes[2] these motions, and FMT opposes Boland's motion for summary judgment with respect to FMT's claims against Boland.[3] Boland and FMT each filed replies[4] to the responses in opposition to their respective motions. For the reasons that follow, the Court grants Boland's motion. The Court grants FMT's motion in part and denies it in part.

## I.      FACTUAL BACKGROUND

Beverly owns and operates the dredge BELLA ROSE.[5] During Hurricane Ida, in August 2021, the BELLA ROSE broke free from its moorings and partially sank in the Mississippi River.[6] The vessel was salvaged and towed to FMT to undergo

---

[1] R. Doc. No. 56 (Boland's motion); R. Doc. No. 57 (FMT's motion).
[2] R. Doc. No. 61.
[3] R. Doc. No. 60.
[4] R. Doc. No. 63 (FMT's reply); R. Doc. No. 64 (Boland's reply).
[5] R. Doc. No. 7, at ¶ 7.
[6] *Id.* at ¶¶ 10–11.

repairs.[7] Beverly alleges that it entered into a "Repair Contract" with FMT, which "obligated FMT to among other things inspect and rebuild the [j]et [p]ump and [h]ydraulic [s]ystem on the BELLA ROSE."[8] The hydraulic system referenced in the complaint was the Metso T46WD Thomas Simplicity Dredge Pump ("Metso pump").[9]

FMT selected Boland as a subcontractor to inspect the Metso pump.[10] Beverly's complaint asserts that, in January 2022, the Metso pump was transported by FMT to Boland's machine shop to be rebuilt.[11] Boland's inspection revealed damage to the Metso pump, including cavitation and cracks in the pump's 46" impeller.[12]

Boland contacted the Metso parts distributor and received an email on January 12, 2022 that there was a 125-day lead time to receive a new impeller.[13] Boland also claims that it had the Metso pump tested to determine whether the impeller could be repaired with welding or whether it was made from a substance known as "white iron," which cannot be repaired with welding.[14] On January 13, 2022, Boland states that it received written confirmation that the impeller was made of "white iron" and could not be repaired with welding.[15] Boland claims that its representatives asked Beverly employees whether it had a spare impeller but was informed that it did not.[16]

---

[7] *Id.* at ¶ 12.
[8] *Id.* at ¶ 13.
[9] R. Doc. No. 56-2, at ¶ 12.
[10] R. Doc. No. 57-10, at 1.
[11] R. Doc. No. 7, at ¶ 19.
[12] R. Doc. No. 56-2, at ¶ 16.
[13] *Id.* at ¶¶ 18–19.
[14] *Id.* at ¶ 17.
[15] *Id.* at ¶¶ 20–21.
[16] *Id.* at ¶28.

Boland also states that it contacted the Metso pump manufacturer to inquire about a repair alternative to welding.[17] The manufacturer informed Boland that an epoxy coating could temporarily repair this type of impeller.[18] Boland's representative Walter Haley testified in a written declaration that he "informed FMT's Project Manager, David Cascio, of: (i) the metallurgical test results for the Metso Pump impeller, (ii) the unavailability of welding on the impeller as a repair option, (iii) the 125-day lead time for a new impeller, (iv) the unavailability of spare impeller from Beverly, and (v) the option of a temporary epoxy repair on the impeller."[19]

David Cascio testifies in his deposition that he discussed the lead times for obtaining a replacement impeller with Beverly's representative, Ronnie Schmitt, and that this lead time was unacceptable to Beverly.[20] Beverly claims that neither FMT nor Boland informed Beverly that the epoxy repair was intended to be temporary.[21]

In January and early February of 2022, the parties exchanged a series of emails including quotes and estimates for the work on the Metso pump. Boland sent its price quotes and time estimate of four to five weeks for the repairs to FMT.[22] FMT

---

[17] *Id.* at ¶ 22.
[18] *Id.*
[19] R. Doc. No. 56-4, at ¶ 22.
[20] R. Doc. No. 57-7, at 6–8.
[21] R. Doc. No. 61, at 4.
[22] *See* R. Doc. No. 56-8; R. Doc. No. 56-10, at 2–4.

emailed its quotes to Beverley.[23] And FMT sent its purchase orders and requests to "start on the work" to Boland.[24]

Boland completed its work on the Metso pump in March 2022.[25] The Metso pump was returned to FMT's yard, where FMT installed it aboard the BELLA ROSE.[26] FMT then completed its repairs on the BELLA ROSE on or about July 15, 2022, and the vessel was returned to Beverly on or about July 16, 2022.[27] FMT asserts that it had no further "hands-on involvement" with the BELLA ROSE after that date.[28]

Beverly then contends that the BELA ROSE encountered a series of problems almost immediately upon return to work.[29] Beverly alleges that, on July 25, 2022, the Metso pump's packing was leaking water and sand and that there were two broken ring bolts, requiring dredge operations to be shut down.[30] The captain of the BELLA ROSE, Justin Pajeaud ("Captain Pajeaud"), testified in his deposition that he repaired the packing and the brass ring bolts within one hour, whereupon the dredge resumed normal operations.[31] Captain Pajeaud further testified that changing the

---

[23] *See* R. Doc. No. 56-9.
[24] *See* R. Doc. No. 56-10, at 3–4.
[25] R. Doc. No. 56-2, at ¶ 53.
[26] R. Doc. No. 57-1, at 3; R. Doc. No. 56-2, at ¶ 53.
[27] R. Doc. No. 7, at ¶¶ 21–22; R. Doc. No. 57-1, at 3.
[28] R. Doc. No. 57, at 1.
[29] *See* R. Doc. No. 61, at 4.
[30] *Id.*
[31] R. Doc. No. 57-6, at 7–9.

packing is a part of the crew's routine dredge maintenance whenever too much water comes through the bilge.[32]

Beverly claims that, in a second incident on September 25, 2022, the BELLA ROSE had problems with the thrust bearing box of the Metso Pump, including broken bolts and damaged seals.[33] Beverly's complaint states that on or about October 5, 2022, Beverly brought the BELLA ROSE to Boland for assessment and repair.[34] In addition to the seals and bolts, Boland claims that it "found several deficiencies in the installation and mounting of the Caterpillar engine and reduction gear box" and found that the drive system was out of alignment.[35] Boland states that it repaired the seals and realigned the drive system.[36] But Boland claims that the dredge left Boland's facility early, on October 11, 2022, without an opportunity to test the dredge according to its normal procedure or do final adjustment on the labyrinth seals.[37]

Beverly asserts that, shortly after the BELLA ROSE resumed work, the crew noticed a seal spinning on the shaft.[38] Beverly states that it called Boland, whose personnel came out to fix the issue.[39] Boland asserts that their personnel made the necessary adjustments to the labyrinth seals,[40] and the BELLA ROSE returned to

---

[32] *Id.* at 5–6.
[33] R. Doc. No. 61, at 5.
[34] R. Doc. No. 7, at ¶ 33.
[35] R. Doc. No. 56-2, at ¶¶ 71–73.
[36] *Id.* at ¶ 74.
[37] R. Doc. No. 56-1, at 10–11.
[38] R. Doc. No. 61, at 5.
[39] *Id.*
[40] R. Doc. No. 56-1, at 10.

normal operation.[41] Boland also submits a video taken by its personnel on October 12, 2022 while aboard the vessel.[42] Boland describes the video as showing the Metso pump system operating normally and without excessive vibration as well as showing water emanating from the packing gland of the Metso pump and spraying onto the radial bearing assembly.[43]

Boland sent its invoice for the work related to the second incident to FMT on October 25, 2022 along with strong recommendations to repair the engine foundation.[44] FMT paid the invoice.[45] Beverly alleges that FMT did not follow Boland's recommendations.[46]

In the final incident, Beverly states that the front/radial bearings nearest to the Metso pump failed on October 22, 2022 and had to be returned to Boland for repairs on October 28, 2022.[47] Boland believed that lack of lubrication caused the problem and that the lubrication had been washed out by the mixture of water and sand emanating from the packing.[48] Boland recommended that Beverly replace the damaged pedestal radial bearing assembly and install a protective shield (known as

---

[41] R. Doc. No. 61, at 5.
[42] R. Doc. No. 56-15 (manual attachment).
[43] *See* R. Doc. No. 56-1, at 10.
[44] R. Doc. No. 56-14.
[45] R. Doc. No. 56-1, at 11–12.
[46] R. Doc. No. 60-1, at 1–2.
[47] R. Doc. No. 61, at 5.
[48] *Id.* at 5; R. Doc. No. 56-2, at ¶ 83.

a slinger ring) to help maintain lubrication.[49] Boland further recommended that Beverly replace the impeller.[50]

Beverly brought the above captioned suit against FMT and Boland claiming that "[t]he work performed by FMT and its subcontractors, including Boland, was negligent, grossly negligent, substandard and not performed in a good workman like manner."[51] Beverly made claims for breach of contract, negligence, breach of the warranty of workmanlike performance, and breach of the implied duty of good faith and fair dealing.[52] Beverly does not claim damages to persons or any property other than the Metso pump.[53] FMT filed counterclaims against Beverly for unpaid services and crossclaims against Boland for breach of contract, negligence, indemnity, and contribution.[54]

## II.   STANDARD OF LAW

Summary judgment is proper when, after reviewing the materials in the record, a court determines that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."

---

[49] R. Doc. No. 56-2, at ¶ 92.
[50] *Id.*
[51] R. Doc. No. 7, at ¶ 24.
[52] *Id.* at 1.
[53] *See generally id.*
[54] R. Doc. No. 8, at 17–21.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The party seeking summary judgment need not produce evidence negating the existence of a material fact; it need only point out the absence of evidence supporting the other party's case. *Id.*; *see also Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1195–96 (5th Cir. 1986) ("There is no sound reason why conclusory allegations should suffice to require a trial when there is no evidence to support them even if the movant lacks contrary evidence.").

Once the party seeking summary judgment carries that burden, the nonmoving party must come forward with specific facts showing that there is a genuine dispute of material fact for trial. *See Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The showing of a genuine dispute is not satisfied by creating "'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations omitted). Rather, a genuine dispute of material fact exists when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

If the movant's story is "blatantly contradicted by the record"—including a videotape—such that "no reasonable jury could believe it," the court should "view[] the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 380–81 (2007). If the nonmovant fails to meet its burden of showing a genuine issue for trial that could support a judgment in favor of the nonmovant, summary judgment must be granted. *See Little*, 37 F.3d at 1075–76.

8

The party responding to the motion for summary judgment may not rest upon the pleadings but must identify specific facts that establish a genuine issue. *Anderson*, 477 U.S. at 248. The nonmoving party's evidence, however, "is to be believed, and all justifiable inferences are to be drawn in [the nonmoving party's] favor." *Id.* at 255. If the nonmovant fails to meet its burden of showing a genuine dispute for trial that could support a judgment in favor of the nonmovant, summary judgment must be granted. *See Little*, 37 F.3d at 1075–76.

### III.   ANALYSIS

#### a.  The Economic Loss Rule

Boland first argues that Beverly's tort claims against it are barred by the economic loss rule[55] as outlined in *East River Steamship Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858 (1986).

In *East River*, the plaintiffs chartered ships built by Shipbuilding. *East River*, 476 U.S. at 859–60. Shipbuilding, in executing its contract, contracted with a turbine manufacturer to "design, manufacture, and supervise the installation of turbines." *Id.* at 859. After the plaintiffs purchased the ships, they began to experience problems with the ship's turbines, causing them to not function properly and causing damage to other parts of the turbine. *Id.* at 859–61. The plaintiffs brought tort claims against the turbine manufacturer under a theory of products liability. *Id.* at 861. While the U.S. Supreme Court recognized products liability claims under maritime law, this acknowledgement was limited. *See id.* at 865.

---

[55] R. Doc. No. 56, at 16.

To preserve the distinction between tort claims under products liability and warranty claims under contract, the Supreme Court stated that tort claims under products liability must generally involve either personal injuries or injuries to "other property." *Id.* at 866–67. In contrast, when a product fails to function properly in a way that damages only the product itself, that claim is more properly brought under warranty. *Id.* at 867–68. "Even when the harm to the product itself occurs through an abrupt, accident-like event, the resulting loss due to repair costs, decreased value, and lost profits is essentially the failure of the purchaser to receive the benefit of its bargain—traditionally the core concern of contract law." *Id.* at 870. The Supreme Court therefore announced the economic loss rule and held that, pursuant to federal maritime law, "a manufacturer in a commercial relationship has no duty under either a negligence or strict products-liability theory to prevent a product from injuring itself." *Id.* at 871.

In outlining what could qualify as "other property" sufficient to sustain a tort claim, the *East River* court considered the entire turbine "a single unit" and did not distinguish between various parts of the turbine unit. *Id.* at 867. The other parts of the turbine that were damaged therefore did not constitute other property. "Since all but the very simplest of machines have component parts, [a contrary] holding would require a finding of 'property damage' in virtually every case where a product damages itself. Such a holding would eliminate the distinction between warranty and strict products liability." *Id.* (quoting *Northern Power & Engineering Corp. v. Caterpillar Tractor Co.*, 623 P.2d 324, 330 (Alaska 1981)).

In *Employers Insurance of Wausau v. Suwannee River Spa Lines, Inc.*, 866 F.2d 752, 755 (5th Cir. 1989) ("*Employers Insurance*"), the Fifth Circuit extended the economic loss rule announced in *East River* to contracts for professional services "rendered as part of the construction of a vessel."

The plaintiffs in *Employers Insurance* contracted with various parties to construct a tugbarge. *Id.* at 755–56. On its second voyage, the tug encountered rough waters, and the crew noticed damage to the linkage system connecting the tug to the barge. *Id.* at 756. This caused the barge to move against the hulls of the tug, ultimately opening large holes in the hulls and causing the tug to sink. *Id.* The plaintiffs sued the construction supervisor and designer of the tug, alleging breach of contract as well as negligent performance of the contract. *Id.* at 756–57. On appeal, the Fifth Circuit extended *East River* to service contracts and precluded plaintiff's negligence claims, noting that this was necessary to preserve the economic loss rule. *Id.* at 765–66. "To hold otherwise would allow a plaintiff who contracts separately for 'services' related to the manufacturing process . . . to recover in tort for purely economic losses . . . while *East River* would bar any similar recovery in cases in which those same services are performed by the manufacturer itself." *Id.* at 766.

Finally, in *Nathaniel Shipping Inc. v. General Electric Co.*, 920 F.2d 1256 (5th Cir. 1991) (hereinafter "*Nathaniel Shipping I*"), the Fifth Circuit applied the economic loss rule to a contract for repairs where the only injury complained of was "delay in getting [ the plaintiff's] ship fixed." *Nathaniel Shipping I*, 920 F.2d at 1264–65. The court applied this rule even though the shipowner had no contractual relationship

with the subcontractor that performed the complained-of repair. *Id.* at 1265. In holding that privity was not required to apply the economic loss rule, the Fifth Circuit noted that the parties in *East River* also lacked contractual privity. *Id.*

In addition to clarifying the types of contracts to which *East River* applies, the Fifth Circuit has also clarified how to determine whether property damage is to "other property" and therefore sufficient to support a tort claim at admiralty. The court in *Shipco 2295, Inc. v. Avondale Shipyards, Inc.*, 825 F.2d 925 (5th Cir. 1987) held that the proper test for this question was to look to the "object of the contract or bargain that governs the rights of the parties." *Shipco*, 825 F.2d at 928. Because the plaintiffs in that case entered contracts for the construction of completed vessels and "did not bargain separately for individual components of each vessel," the court held that "completed vessels were obviously the objects of the contract." *Id.* The plaintiffs were therefore limited to their contractual claims when the complaint alleged that some components of the vessel caused damage to other components. *Id.* at 929. The court explained that to hold otherwise "would undermine this central objective of *East River* that the parties receive the benefit of their bargain" and would "give the buyer greater rights to recover economic losses for [defects]" when the "component is designed, constructed, or furnished by someone other than the final manufacturer." *Id.* at 928–29.

The Fifth Circuit has reaffirmed the *Shipco*-type analysis on several occasions. *See, e.g.*, *Nicor Supply Ships Assocs. v. General Motors Corp.*, 876 F.2d 501, 505–06 (5th Cir.1989) (holding that seismic equipment brought aboard a year after executing

a contract for purchase of the vessel was "other property" that could support a tort claim because it was not originally bargained for under the purchase contract); *Petroleum Helicopters, Inc. v. Avco Corp.*, 930 F.2d 389, 390–91, 393 (5th Cir. 1991) (holding that, because a removable floatation device was installed inside a helicopter before the purchase contract, the floatation device was part of the helicopter and the helicopter therefore was not "other property" sufficient to support a tort claim); *Smith Mar., Inc. v. L/B KAITLYN EYMARD*, 710 F.3d 560, 563–65 (5th Cir. 2013) (holding that, because the plaintiff purchased the vessel and contracted for installation of additional living quarters in the same contract, damage to the living quarters caused by an improperly mounted crane on the ship was not damage to "other property").

Here, Beverly's contracts are service contracts for repairs and are encompassed within the class of contracts to which *East River* applies pursuant to the Fifth Circuit's holdings in *Employers Insurance* and *Nathaniel Shipping I.* The economic loss rule applies where the alleged negligence is committed by a subcontractor with whom the plaintiff lacks any contractual privity in accordance with *Nathaniel Shipping I.* While Beverly argues that Louisiana law has abandoned a mechanical application of the economic loss doctrine,[56] courts may only apply state law to maritime claims "where it serves to supplement, but not contravene, the general maritime law by filling a 'gap' therein." *Parekh v. Argonautica Shipping Invs. B.V.*, 2017 U.S. Dist. LEXIS 127800, at *6 (E.D. La. Aug. 11, 2017) (Morgan, J.). Federal maritime law is clear on this point and cannot be supplemented with conflicting state

---

[56] R. Doc. No. 61, at 12–13.

law. The fact that this case involves a contract for repairs and that both Beverly and Boland deny any contractual privity,[57] then, will not foreclose *East River*'s applicability.

Beverly does not allege any personal injuries or damage to property other than the Metso Pump.[58] Instead, Beverly alleges that negligent performance by FMT and Boland in repairing certain components of the Metso pump caused damage to other components of the Metso pump.[59] These damages do not qualify as damage to "other property" pursuant to a *Shipco* analysis. Beverly's bargain was for the repair of its ship. Though Beverly and FMT may have bargained over which parts of the ship would be fixed, the quote for repairs did not distinguish between different components of the Metso pump. Instead, the line item for the repair to the Metso pump read "Thompson 20[ inch] Suction Head Rebuild" and referred to the Metso pump as a single unit.[60] The alleged failure of FMT and Boland to deliver Beverly the benefits of its bargain are properly brought as a contract claim. Therefore, Beverly's tort claims against Boland and FMT will be dismissed along with FMT's tort claims against Boland.

Accordingly, FMT's claim against Boland for contribution must also be dismissed. Claims of contribution require showing of a breach of duty by a joint tortfeasor. *Conti 11. Container Schiffahrts-GmbH & Co. v. New Orleans Terminal,*

---

[57] *See* R. Doc. No. 56-1, at 1; R. Doc. No. 61, at 15.
[58] *See generally* R. Doc. No. 7.
[59] *Id.* at ¶ 24; R. Doc. No. 61, at 3–5.
[60] *See* R. Doc. No. 7-1, at 8.

*LLC*, 2016 U.S. Dist. LEXIS 12738, at *19 (E.D. La. 2016) (Barbier, J.). Because all tort claims have been dismissed, FMT's claims for contribution must also be dismissed.

### b. Indemnity

#### i. *Tortious Indemnity and the Implied Warranty of Workmanlike Performance*

Boland next asserts that it is entitled to summary judgment with respect to Beverly's claims for breach of the implied warranty of workmanlike performance because of the lack of contractual privity with Boland.[61] FMT likewise asks this Court to dismiss all of Beverly's claims against it.[62] Beverly responds that, pursuant to Fifth Circuit precedent, contractual privity "is not an absolute requirement to a warranty of workmanlike performance claim" and that Beverly should be permitted to maintain this claim as a third-party beneficiary to the contract between Boland and FMT.[63]

Originating from *Ryan Stevedoring Co. v. Pan-Atlantic Steamship Corp.*, 350 U.S. 124 (1956) ("*Ryan*"), the implied warranty of workmanlike performance allows a shipowner to claim indemnity from a contractor employed on a vessel where that contractor fails its obligation to perform its work in a reasonably safe manner. *See Ryan*, 350 U.S. at 131–32. In *Ryan*, the Court announced this doctrine but limited its holding to stevedoring contracts, suggesting that stevedoring contracts necessarily

---

[61] R. Doc. No. 56-1, at 21.

[62] R. Doc. No. 57-1, at 10–11. FMT does not fully brief many arguments, including the implied warranty of workmanlike performance. *See generally id.* However, for the sake of completeness, this Court analyzes FMT's entitlement to summary judgement alongside Boland's throughout this opinion.

[63] R. Doc. No. 61, at 15.

included an obligation to stow cargo properly and safely. *Id.* at 134. In so holding, the Court allowed the shipowner to claim indemnity against the stevedoring contractor for damages that it paid to a longshoreman for injuries sustained because of the contractor's negligence. *Id.* at 125.

The *Ryan* doctrine was "conceived as an admiralty concept to serve special problems in maritime law arising from the absolute and nondelegable duty of seaworthiness imposed by the general maritime law upon all vessel owners." *Whisenant v. Brewster-Bartle Offshore Co.*, 446 F.2d 394, 399 (5th Cir. 1971). Privity is not required for this warranty to apply because the stevedore's implied warranty "is plainly for the benefit of the vessel whether the vessel's owners are parties to the contract or not." *Crumady v. The Joachim Hendrik Fisser*, 358 U.S. 423, 428 (1959). "The ship and the shipowner are deemed to be third-party beneficiaries of any stevedoring contract. . . ." *Loffland Bros. Co. v. Roberts*, 386 F.2d 540, 549 (5th Cir. 1967).

The Fifth Circuit has noted that it is "extremely hesitant to extend the burdensome *Ryan* doctrine to situations not substantially similar to those which gave birth to the doctrine." *Id.* However, the Fifth Circuit has extended the doctrine to apply to contracts other than stevedoring contracts. *See Whisenant,* 446 F.2d at 396, 400−01 (applying the *Ryan* doctrine to a claim against a contractor performing drill pipe testing services aboard a drill barge when the contractor's negligence caused the death of one of its employees, despite no privity between vessel owner and the contractor). The Fifth Circuit has also applied the doctrine to claims for damages to

property. *See Todd Shipyards Corp. v. Turbine Serv.*, Inc., 674 F.2d 401, 405, 416–17 (5th Cir. 1982) (holding that the *Ryan* doctrine applied to an action by a general contractor against a sub-subcontractor that completed negligent repairs to the vessel where no privity existed between the parties and the only damage claimed was damage to property).

The Fifth Circuit later questioned the *Todd Shipyard* holding in *Nathaniel Shipping, Inc. v. General Electric Co.*, 932 F.2d 366 (5th Cir. 1991) ("*Nathaniel Shipping II*"), noting that the extension was "dubious at best" because the warranty of workmanlike performance's "origins are in contract rather than tort." *Nathaniel Shipping II*, 932 F.2d at 367. The court noted that the U.S. Supreme Court had only extended the implied warranty or workmanlike performance to parties lacking privity when it "concluded that the owner was essentially a third-party beneficiary of an agreement between the contractor and a third party." *Id.*

However, the court declined to revisit the issue of whether the *Ryan* doctrine could be applied to parties who lacked privity or status as a third-party beneficiary because the economic loss doctrine announced in *East River* foreclosed "any extra-contractual liability" for economic losses. *Id.* at 368. The court explained that "a contractor is not liable in tort for the negligence of its carefully chosen sub-contractor" but that contractors may be liable under contract where the subcontractor's negligence causes a breach of contract. *Id.* In those cases, the contractor can seek compensation from its subcontractor "subject to the limitations of the contract." *Id. Nathaniel II* therefore stands for the proposition that the *Ryan* doctrine requires a

17

finding of negligence from which a party can be indemnified. Without a valid claim under tort, claims for indemnification under *Ryan* cannot stand.

Here, the Court has found that the economic loss rule applies and that all tort claims are foreclosed in this case. The claims pursuant to the implied warranty of workmanlike performance are therefore also foreclosed.

### ii.  Indemnity for Breach of Contract

Boland also claims that the red-letter clause of the contract between FMT and Boland forecloses any claims of contractual indemnity because there is no express indemnity provision.[64] FMT does not argue that there is an implied right of indemnity in the contract.[65] Rather, FMT argues that indemnity is an equitable doctrine that entitles a party to compensation for damages awards caused by the fault of another party.[66]

In *Ryan*, the Supreme Court recognized that a contractual right to indemnity may be express or implied, and it created the *Ryan* doctrine as an implied contractual right based on the parties' special relationship. *Ryan*, 350 U.S. at 132–33. The Fifth Circuit has described the *Ryan* doctrine as expressing an "equitable goal" and having an "equitable spirit." *See Coffman v. Hawkins & Hawkins Drilling Co., Inc.*, 594 F.2d 152, 155 (5th Cir. 1979); *Whisenant,* 446 F.2d at 396, 400.

Reviewing the history of equitable or implied indemnity reveals that the doctrine originated as "a judicial response to, the rule against contribution among

---

[64] R. Doc. No. 56-1, at 24.
[65] *See generally* R. Doc. No. 60.
[66] *Id.* at 2.

joint tortfeasors" and allows one held responsible for a tort to recover from a party who caused the harm. *Equitable Indemnity: Introduction*, 3 Bruner & O'Connor on Construction Law § 10:146. Common law indemnity most often arises out of special legal relationships. *Id.* "The contractor-subcontractor relationship, in most instances, does not create a 'special relationship' permitting a claim of common law indemnity." *Id.* And in maritime law, "complete liability cannot be shifted merely because one entity is in a better position to avoid a contractual breach" absent this special relationship. *Sea King Corp. v. Eimskip Logistics, Inc.*, 367 F. Supp. 3d 529, 548–49 (E.D. Va. 2019) (denying a claim of implied contractual indemnity absent a special *Ryan* doctrine relationship).

Based on a review of the Fifth Circuit's descriptions of the *Ryan* doctrine and the origins of equitable indemnity, this Court concludes that the analysis required for equitable indemnity follows the analysis of the *Ryan* doctrine in maritime law. Therefore, FMT's claim for indemnification follows the same analysis as the implied warranty of workmanlike performance, which is only applied to tort claims. Without a claim under a contractual right of indemnity, this claim will be dismissed.

### c. Implied Duty of Good Faith and Fair Dealing

Boland next argues that it is entitled to summary judgement with respect to Beverly's claims against it for breach of the implied duty of good faith and fair dealing because Boland and Beverly lack contractual privity.[67] Beverly claims status as a

---

[67] R. Doc. No. 56-1, at 23.

third-party beneficiary to the contract between FMT and Boland and argues that third-party beneficiaries are owed a duty of good faith and fair dealing.[68]

"[I]n the context of admiralty law[,] . . . each contract carries with it a duty of each party to act in good faith and to deal fairly in performing and enforcing the contract." *Flores v. Am. Seafoods Co.*, 335 F.3d 904 (9th Cir. 2003). "[T]he obligation of good faith and fair dealing is not breached merely by the failure to perform a particular obligation. A mere failure to fulfill an obligation, without a showing of intent or ill will, does not constitute a breach of good faith." *Comar Marine Corp. v. Raider Marine Logistics, L.L.C.*, No. 6:09-CV-1438, 2013 WL 2181036, at *14 (W.D. La. May 20, 2013), *aff'd*, 792 F.3d 564 (5th Cir. 2015) (quoting *Dufrene v. Browning–Ferris, Inc.*, 1997 WL 587765, at *2 (E.D. La., 1997) (Vance, J.).

"[M]aritime law is silent as to whether a breach of the implied covenant of good faith and fair dealing claim can exist independently of a breach of contract claim." *Logan Generating Co., L.P. v. Dann Marine Towing, LC*, 669 F. Supp. 3d 321, 337–38 (D.N.J. 2023). In the absence of an established maritime rule, "the Supreme Court has approved the application of state law where it serves to supplement, but not contravene, the general maritime law by filling a 'gap' therein." *Parekh*, 2017 U.S. Dist. LEXIS 127800, at *6. And pursuant to Louisiana law, "[a] claim for breach of this implied covenant of good faith and fair dealing is necessarily based on the existence of an underlying contract." *Dufrene*, 1997 U.S. Dist. LEXIS 14691, at *6. However, third-party beneficiaries to a contract are also owed a duty of good faith

---

and fair dealing under maritime law. *Freepoint Commodities LLC v. Ridgebury Kilo LLC*, 632 F. Supp. 3d 549, 559–60 (S.D.N.Y. 2022).

Beverly suggests that FMT and Boland knew that the epoxy repair to the Metso pump impeller was only intended to be temporary until parties could order a new impeller.[69] But Beverly maintains that neither party communicated that to Beverly and that at no point did anyone suggest to Beverly that the epoxy repair was intended to be anything other than a full repair of the impeller.[70] And Beverly in support points to invoices from Boland to FMT with recommendations that read "repair/replace 46[inch] impeller,"[71] supporting an inference that repairing and replacing the impeller may have been communicated as comparable alternatives. Beverly points to evidence in Walter Haley's deposition suggesting that FMT enforced a forty-five-day timeline with Boland's repairs, supporting an inference that FMT might have rushed the repair process.[72]

Taking the facts in the light most favorable to Beverly, rushing repairs and failing to fully inform Beverly of the repair's temporary nature "could constitute a bad faith breach of the implied covenant of good faith and fair dealing." *See Johnson v. Daimler Chrysler Corp.*, No. CIV A 206CV36KS-MTP, 2006 WL 3511438, at *3 (S.D. Miss. Dec. 5, 2006) (stating at the summary judgment stage that failure to warn a buyer of a car's defect at the time of purchase could be considered a breach of the

---

[69] *Id.* at 3.
[70] *Id.* at 4.
[71] *Id.* at 3.
[72] *See* R. Doc. No. 61-4, at 13–14.

implied covenant of good faith and fair dealing). Summary judgement with respect to Beverly's claim for breach of the duty of good faith and fair dealing against FMT is therefore not warranted.

However, Beverly's claim of bad faith against Boland will be dismissed because Beverly is not a third-party beneficiary to the contract between FMT and Boland. The Fifth Circuit in *Nathaniel Shipping II* suggested that it did not think that the owner of a vessel was a third-party beneficiary of a contract between a general contractor and a subcontractor. *See Nathaniel Shipping II*, 932 F.2d at 367 n.2. In saying so, the Fifth Circuit cited an illustration in the Restatement (Second) of Contracts. *Id.* This illustration reads, "A contracts to erect a building for C. B then contracts with A to supply lumber needed for the building. C is an incidental beneficiary of B's promise. . . ." *See* Restatement (Second) of Contracts § 302(e) illustration 19 (1981).

The Restatement clarifies that property owners are ordinarily not third-party beneficiaries to contracts between general contractors and subcontractors. *See id.* ("Performance of a contract will often benefit a third person. But unless the third person is an intended beneficiary as here defined, no duty to him is created."). Beverly likewise cites to no cases where a court has declared the owner of a vessel to be third-party beneficiary to a similar contract between a general contractor for repairs and its subcontractor. "A project owner will doubtless receive incidental benefits from its contractor's subcontracts; but those benefits alone will not render the owner a third-party beneficiary." *M.T. Bores, LLC v. Mountain Valley Pipeline, LLC*, 552 F. Supp.

3d 580, 588 (S.D.W. Va. 2021). Accordingly, Beverly's claims against Boland for breach of the implied duty of good faith and fair dealing will be dismissed.

### d. Breach of Contract

Boland next asserts that it is entitled to summary judgment with respect to claims against it for breach of contract.[73] Boland claims this is warranted because it lacks contractual privity with Beverly and because FMT submits no evidence supporting that Boland improperly repaired the Metso pump.[74] FMT submits that it is entitled to summary judgment for any claims by Beverly relating to incidents after July 16, 2022 because FMT was not involved in any of those repairs.[75]

Beverly's response asserts that Beverly's claims can be sustained because Beverly is a third-party beneficiary to the contract between FMT and Boland.[76] FMT's motion advances no argument as to why the Court should not dismiss its claims against Boland for breach of contract.[77] And FMT claims that no contract existed between Boland and FMT after July 2022.[78]

Here, neither Beverly nor Boland asserts that there is contractual privity between them.[79] And, under the analysis above, Beverly is not a third-party beneficiary to any contracts between FMT and Boland. Beverly's claims against Boland for breach of contract will therefore be dismissed.

---

[73] R. Doc. No. 56-1, 21–23.
[74] *Id.*
[75] R. Doc. No. 57, at 1.
[76] R. Doc. No. 61, at 15–16.
[77] *See generally* R. Doc. No. 60.
[78] R. Doc. No. 57, at 1.
[79] See R. Doc. No. 61, at 15; R. Doc. No. 56-1, at 1.

Boland points to an absence in the record of any evidence suggesting that Boland failed to perform the duties of the contract between it and FMT.[80] FMT points to no evidence suggesting breach of contract[81] and claims that no contract existed between FMT and Boland after July 16, 2022.[82] Without any such evidence, there is no genuine dispute of material fact, and FMT's claims for breach of contract against Boland will be dismissed.

However, Beverly's claims against FMT will not be dismissed because there is a genuine factual dispute about whether FMT and Beverly's contractual relationship continued after July 16, 2022 and whether it failed to deliver on its obligations under the contract. Beverly points to testimony from David Cascio's deposition suggesting that Beverly and FMT remained in communication about repairs after July 16, 2022[83] and stating that FMT paid Boland's invoices for work after that date.[84] This evidence supports an inference that FMT and Beverly may have had a continuing contractual relationship after July 16, 2022.

Beverly also points to evidence that, when viewed in the light most favorable to Beverly, supports an inference that FMT may have failed to deliver on its obligations under the contract. Beverly points to various mechanical problems that the BELLA ROSE continued to have after FMT returned the vessel[85] as well as

---

[80] R. Doc. No. 56-1, at 23.

[81] R. Doc. No. 57-1.

[82] *See* R. Doc. No. 57, at 1.

[83] *See* R. Doc. No. 56-12, at 10 (discussing communications between FMT and Beverly in September and October 2022).

[84] R. Doc. No. 56-12, at 11–12.

[85] R. Doc. No. 61, at 4–5.

testimony from Boland representative Walter Haley's deposition suggesting that FMT may have rushed repairs.[86] Boland also points to invoices from Boland showing it found deficiencies after FMT returned the BELLA ROSE to Beverly, suggesting FMT may have done certain repairs improperly.[87] In light of this evidence, there is a genuine dispute of material fact regarding whether FMT breached its contract with Beverly.

## IV.   CONCLUSION

Accordingly, and for the foregoing reasons,

**IT IS ORDERED** that Boland's motion for summary judgment is **GRANTED**. Beverly's and FMT's claims of negligence against Boland are **DISMISSED WITH PREJUDICE**. Beverly's claims of breach of contract, breach of the implied warranty of workmanlike performance, and breach of the implied duty of good faith and fair dealing against Boland are **DISMISSED WITH PREJUDICE**. FMT's claims against Boland for contribution, indemnity, and breach of contract are **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that FMT's motion for summary judgement is **GRANTED IN PART AND DENIED IN PART**. The motion is granted with respect to Beverly's claims of negligence against FMT and Beverly's claim for breach of the

---

[86] *See* R. Doc. No. 61-4, at 13–14 (testifying that FMT had a 45-day requirement to finish work with Boland).

[87] *See* R. Doc. No. 61-7 (outlining Boland's findings in October 2022 and stating that there were alignment issues as well as damage to seals and bolts). It is undisputed that FMT installed the Metso pump aboard the BELLA ROSE. R. Doc. No. 56-2, at ¶ 53.

implied warranty of workmanlike performance. Those claims are **DISMISSED WITH PREJUDICE**. The motion is **DENIED** with respect to Beverly's claims for breach of contract and breach of the implied duty of good faith and fair dealing.

New Orleans, Louisiana, July 3, 2024.

**LANCE M. AFRICK**
**UNITED STATES DISTRICT JUDGE**